[943 NYS2d 410]

In the Matter of NEAL EUGENE WIESNER, for Admission as an Attorney and Counselor-at-Law.

First Department, March 20, 2012

## APPEARANCES OF COUNSEL

*Committee on Character and Fitness for the First Judicial Department* (*Maria M. Matos*, Executive Secretary).

*Ariyike Oshunkoya Diggs*, for petitioner.

## OPINION OF THE COURT

Tom, J.

Petitioner, a twice-convicted felon, submitted his tenth renewed application to the Committee on Character and Fitness for admission to the bar. The unusual and lengthy history of petitioner's efforts to gain admission to the New York bar has been affected by differing views of whether petitioner has the moral character and fitness to practice law. The impediment to approval has been the serious crimes committed by petitioner years ago. In prior applications, we judged the passage of time to be insufficient to evaluate the success and sincerity of his rehabilitation.

The salient events and ensuing criminal trial conducted over a quarter of a century in the past can be briefly summarized. Principally, petitioner was convicted in federal court in connection with his operation of a business from about 1980 to 1982 that had the appearance of legality but which was actually an illegal enterprise for distribution of Quaaludes. Petitioner ran putative sleep clinics where he would direct drug purchasers to physicians participating in the scheme, who would then write prescriptions for the purchasers, which would be filled by participating pharmacies. The scheme was both extensive and financially successful and allowed petitioner to lead a flamboyant lifestyle, including his own extensive drug use. However, his life increasingly spiraled out of control and, as federal authorities closed in, he entered into a despondent emotional state that manifested itself in criminal acts committed in July 1983 against his former girlfriend, who also was involved in the drug distribution scheme. Although the girlfriend had separated from petitioner and moved out months earlier, she yielded to his request to see her again. When they met, he displayed a gun and kept her in her apartment for more than seven hours until she tried to escape while he was in the bathroom. As she jumped from the second floor apartment and tried to flee (seriously injuring herself), petitioner fired five or six shots in her direction but did not hit her. According to petitioner's testimony, he had told her that he intended to commit suicide.

Petitioner was arrested, and in 1985, after a jury trial in Richmond County, he was convicted of attempted murder in the second degree, burglary in the first degree, unlawful imprisonment in the first degree, criminal possession of a weapon in the second degree and criminal use of a firearm in the first degree for which he was sentenced to 12½ to 25 years (*People v Wiesner*,

129 AD2d 753 [1987], *lv denied* 70 NY2d 658 [1987], *lv dismissed* 71 NY2d 1034 [1988]). In 1987, he pleaded guilty in the United States District Court for the Southern District of New York to conspiracy to violate federal narcotics laws and to distribution and possession of Quaaludes. He was sentenced to time served, having been in federal custody since his December 1984 arrest.

However, in 1989, Judge Raymond Dearie, of the District Court for the Eastern District of New York, granted a habeas corpus petition on the ground that petitioner was denied his constitutional right to represent himself at the trial of the state charges (*Wiesner v Abrams*, 726 F Supp 912 [ED NY 1989], *affd* 909 F2d 1473 [2d Cir 1990]). In March 1991, on the eve of retrial, petitioner entered an *Alford-Serrano* plea (for which he did not have to allocute to the facts of his guilt) to attempted murder in the second degree in exchange for a sentence of 2 to 6 years, nunc pro tunc from December 1984, to run concurrently with time served for his federal conviction. As a result of the two convictions, petitioner was incarcerated from December 1984 to January 1990.

After his release from prison, in a remarkably short period of time, petitioner obtained a college degree and a law degree from CUNY School of Law, and passed the bar in 1994. These academic achievements reflect well on petitioner's intelligence and competence, and demonstrate his capacity to reassert control over his future. However, these achievements, while commendable, do not resolve the issue we must determine, which is whether petitioner has been sufficiently rehabilitated to satisfy the character and fitness requirement set forth in Judiciary Law § 90 for admission to the bar.

Petitioner's first application to practice law was submitted to this Court's Committee on Character and Fitness in January 1995. The application was not approved, and this Court subsequently denied nine successive motions by petitioner seeking to renew his application for admission. On August 19, 2009, this Court granted his tenth motion to the extent of referring his renewed application to the Committee for "investigation, hearing and recommendation." An evidentiary hearing was conducted before a subcommittee of the Committee on Character and Fitness, which, on February 22, 2010, unanimously recommended his admission. On March 9, 2010, the full Committee met and, by a vote of 20 to 3, recommended petitioner's admission.

It is evident that the Committee accorded much significance to petitioner's ability over an extended period of time to pursue

a productive and positive life and career. Our careful review of the record likewise persuades us that these accomplishments are substantial indications of his rehabilitation.

Petitioner's criminal conduct, committed almost 30 years ago, involved well-orchestrated dishonesty, culminating in his federal conviction, rampant drug use and an inexplicable and almost impulsive act of violence towards his former girlfriend, leading to his New York conviction. The operative question is whether the record demonstrates that petitioner has completely rehabilitated himself, with specific reference to those character traits, so that he may now be said to possess the requisite character and fitness to practice law. We consider it particularly relevant that petitioner has been admitted to the bar in a number of other jurisdictions, where he has been practicing law for several years without incident. With these factors in mind, we turn to the applicable standards and the testimony offered in support of petitioner's application.

Judiciary Law § 90 (1) (a) directs, in relevant part, that upon certification that a person has passed the bar examination, the Appellate Division, upon being satisfied that "such person possesses the character and general fitness requisite for an attorney and counsellor-at-law . . . shall admit him to practice as such attorney and counsellor-at-law." "Character," often termed moral character in case law and commentary, is not defined in the statute, and is usually portrayed in terms of the applicant's fulfillment of professional responsibilities. Notably, the statute does not contemplate open-ended moral findings of a personal nature. Thus, the statute reflects no intent to impose a continuing punishment on an applicant with a criminal past. Although the seriousness of prior crimes remains an important, and perhaps sometimes dispositive, consideration, the Court's task is to evaluate the prospective risk that the applicant will abuse the trust and responsibilities bestowed upon him by virtue of his professional status. Therefore, our analysis proceeds on an evaluation of the record to determine whether the applicant possesses behavioral traits that may constitute a threat to individual clients or society in general and undermine the integrity of the legal system.

Since Judiciary Law § 90 does not provide a set of standards to evaluate bar applicants with a criminal record, we may be guided by the standards promulgated by the American Bar Association, which involve a number of related inquiries: the applicant's age when the crime was committed, whether the crime

was recent, whether the information about the crime is reliable, the seriousness of the conduct, underlying factors, the cumulative consequences of the crime, evidence of the applicant's rehabilitation, whether the applicant has since made a contribution to society, the applicant's honesty during the application process and, in that regard, whether the applicant omitted material information or made material misrepresentations (Comprehensive Guide to Bar Admissions Requirements, ABA Section of Legal Education and Admissions to the Bar and National Conference of Bar Examiners at vii-viii [1994-1995]). With respect to these criteria, the record shows that petitioner was in his 20s when he committed his crimes, which, though very serious, are not recent, having occurred some three decades ago; the evidence in support of his convictions is beyond dispute; he seriously injured a woman whom he professed to love; and he sold significant quantities of controlled substances to prescription drug abusers. In assessing petitioner's present application, we have focused on the extent of his rehabilitation, his contributions to society and his candor before the Committee.

Case law and commentary weigh not only the seriousness of an applicant's criminal history, but also the risk that he may pose as a lawyer. Conversely stated, the inquiry is whether the record establishes that the applicant has been rehabilitated to the extent that the traits that led to his criminal conduct have been demonstrably excised from his character. However, evaluating an applicant's moral growth as a measure of his rehabilitation is difficult, which explains the extensive history of petitioner's applications. Many attempts to address the issue of rehabilitation start with Justice Hugo Black's observation that moral character "by itself, is unusually ambiguous . . . any definition will necessarily reflect the attitudes, experiences, and prejudices of the definer" (Konigsberg v State Bar of Cal., 353 US 252, 262-263 [1957]). Elsewhere it has been observed that "[w]e are unable to see inside [the applicant's] head. A person's character is far more accurately indicated by his prior actions" (Application of Maria C., 294 Md 538, 541, 451 A2d 655, 656 [1982]). Thus, objective evidence of such an applicant's rehabilitation should be more important than speculation about the internal workings of that applicant's thinking.

If the seriousness of the criminal history alone were dispositive, some consistency in New York decisions would be expected. However, the factors that courts have considered in making admission decisions are not easily categorized. In a decision of

some vintage, a New York applicant's character was sufficiently challenged as lacking veracity to justify rejection because of his testimonial contradictions both as a defendant and as an applicant before the Committee on Character and Fitness (*Matter of Cassidy*, 268 App Div 282 [1944], *affd* 296 NY 926 [1947]), although in that case the applicant's advocacy of the government's overthrow during a tense historical epoch and other factors augmented the reasons for rejection. The Third Department rejected an applicant, on the recommendation of the Committee, because of his criminal history, which included convictions for bank robbery and murder in the first degree (*Matter of Roger MM.*, 96 AD2d 1133 [1983]), yet declined to reject another applicant on the basis of his nine-year-old conviction for assault in the second degree (*Matter of Newhall*, 143 AD2d 293 [1988]). It is evident that serious misconduct in the past must be considered in the context of more recent evidence; criminal history, and how it bears on an application, must be evaluated through the prism of the present since the test is whether the applicant *currently* possesses the character and fitness to practice law (*Matter of Anonymous*, 212 AD2d 1067 [1995]). Thus, in another Third Department case, evidence that from 1990 to 2004 an applicant was cited for numerous traffic violations, failed to disclose his arrest record on his law school application, was discharged from multiple jobs for misconduct, was less than candid about his past conduct, and was diagnosed with, and was under current treatment for, alcohol and marijuana dependency, presented recent and even continuing hurdles over which the applicant could not pass (*Matter of Anonymous*, 52 AD3d 1168 [2008]).

In analyzing whether an applicant with a criminal past has demonstrated adequate rehabilitation, two inquiries generally present themselves: the scope of conduct to be evaluated and the time frame to be employed. In determining what scope of conduct should be considered, the seriousness of the crimes is important, as previously noted, but so too are more recent patterns of behavior that may persuasively demonstrate the applicant's good character. Rehabilitation means that the record provides a basis to believe that the applicant's past problems are no longer manifest and his life has changed in such a manner that their recurrence is unlikely (*Application of Cason*, 249 Ga 806, 294 SE2d 520 [1982]; Carr, Note, *The Effect of Prior Criminal Conduct on the Admission to Practice Law: The Move to More Flexible Admission Standards*, 8 Geo J Legal Ethics

367, 386 [Winter 1995]) and that he "has undertaken a useful and constructive place in society" (George L. Blum, Annotation, *Criminal Record as Affecting Applicant's Moral Character for Purposes of Admission to the Bar*, 3 ALR6th 49, § 14, citing *Matter of Prager*, 422 Mass 86, 661 NE2d 84 [1996]; Carr at 386), can be trusted by clients and will not pose a danger to the public (Clemens, *Facing the Klieg Lights: Understanding the "Good Moral Character" Examination for Bar Applicants*, 40 Akron L Rev 255, 268 [2007]). This concept will be revisited in the assessment of petitioner's character references and the testimony offered in support of his admission.

In evaluating whether a former offender has sufficiently abandoned the traits that contributed to his criminal record so that he may be found to be rehabilitated, the passage of time is significant. The conduct of petitioner, now in his sixth decade of life, over the last 30 years affords a clearer image of his *current* character and what it portends for the future of his legal career. That being said, time is not, by itself, the dispositive factor demonstrating that an applicant has rehabilitated his character (Blum at § 14; Clemens at 281). The seriousness of past crimes may require a longer period to demonstrate successful rehabilitation (Blum at § 14). It has been observed that "[t]ime alone will not alleviate the damage of a conviction. No specific time is necessary or sufficient to demonstrate rehabilitation" (Clemens at 281 [footnote omitted]).

There is scant New York jurisprudence to guide us on the minimum period of time that should elapse before an applicant's rehabilitation can be safely evaluated, which necessarily implicates the nature of the prior criminal conduct. Case law from other jurisdictions, though useful, must be regarded with circumspection, due to the abbreviated factual summaries often included in the decisions. Applications have often been denied because of the brevity of the intervening period, sometimes compounded by other factors, including the applicant's lack of candor (*see e.g. In re Gossage*, 23 Cal 4th 1080, 5 P3d 186 [2000] [applicant killed his sister 25 years before; rehabilitation defeated by 16 additional crimes that were committed between his release on parole and his application for admission, some of which were omitted from the application]; *Seide v Committee of Bar Examiners*, 49 Cal 3d 933, 782 P2d 602 [1989] [seven-year period since applicant's arrests during law school insufficient to purge extensive history of drug trafficking convictions]; *Florida Bd. of Bar Examiners re G.J.G.*, 709 So 2d 1377 [Fla 1998] [ap-

plicant, charged with aggravated assault three years before filing amended bar application, cheated on bar exam six years before; pattern of conduct and insufficient passage of time warranted denial]; *In re Childress*, 138 Ill 2d 87, 561 NE2d 614 [1990] [16 years since rape and robbery convictions insufficient for rehabilitation]; *Prager*, 422 Mass 86, 661 NE2d 84 [substantial marijuana smuggling operation resulting in four felony convictions, six years before application]; *Matter of Moore*, 308 NC 771, 303 SE2d 810 [1983] [applicant, convicted of murder and assault on a female 12 years before application, made threats in the interim]). Conversely, applicants with serious criminal records have been admitted after an intervening period far shorter than the three decades involved in the present case (*see e.g. In re Manville*, 538 A2d 1128 [DC 1988] [three applicants admitted to bar notwithstanding 15-, 17- and 22-year-old convictions for voluntary manslaughter, attempted robbery, and narcotics distribution]; *In re Polin*, 630 A2d 1140 [DC 1993] [nine-year-old conviction for conspiracy to distribute cocaine]; *Application of James G.*, 296 Md 310, 462 A2d 1198 [1983] [applicant charged with, albeit not convicted of, two murders, but convicted of simple assault and forgery and uttering, 12 years before application]; *Application of Strait*, 120 NJ 477, 577 A2d 149 [1990] [applicant's drug charges occurred five years before granted admission; court rejected Committee's conclusion that applicant was not candid]; *In re Beers*, 339 Or 215, 118 P3d 784 [2005] [although candor remained questionable, applicant granted admission despite 13-year-old felony conviction for conspiracy to distribute cocaine and additional misdemeanor convictions]).

It is obvious that there is no bright-line rule as to how much time is adequate. Trying to devise such a standard would be a pointless exercise in view of the sui generis nature of these cases. However, in the context of the cited rulings, the passage of time in the present matter assumes significant importance. The time elapsed since petitioner's offenses were committed provides a very long continuum along which to assess his moral trajectory, his trustworthiness as a practicing attorney, his willingness to conform to professional ethical requirements, his nonviolence and, of equal import in this case, his ability to remain drug free, since that weakness seems inextricably connected to his past criminal conduct. Petitioner's record in the quarter of a century since his release from prison—equaling almost one half of petitioner's life—affords ample opportunity to judge the state of petitioner's current character.

At the time of petitioner's first application for admission in 1995, a subcommittee of the Committee on Character and Fitness held hearings, at which petitioner was represented by the late Haywood Burns, Esq., one-time Dean of CUNY School of Law. A majority of the subcommittee voted to reject petitioner's application because of the seriousness of his crimes, the inadequate passage of time and some uncertainties regarding his explanation about his state of mind preceding the shooting of his former girlfriend (some 12 years before) that had resulted in his conviction for attempted murder. This Court likewise rejected the application notwithstanding the recommendations by respected members of the bar and others who had the time and opportunity to become familiar with petitioner. The perspective afforded by time and familiarity was unavailable to this Court, which could only gain the necessary information to evaluate petitioner over an extensive time period. Though petitioner was persistent, his subsequent motions for admission met with similar results. In denying a renewal motion in 2006, we acknowledged petitioner's admission to the bar in other jurisdictions, but nevertheless declined to grant affirmative relief. Ultimately, by order entered August 17, 2009, we granted petitioner's renewal motion to the extent of referring the matter to the Committee for an investigation, hearing and recommendation. In his moving papers, petitioner pointed out that 26 years had intervened since his crimes; he had then reached the age of 55; he had been admitted to practice in the federal courts for the Eastern, Western, Northern and Southern Districts of New York, and the Second and Third Circuit Courts of Appeal; and, since 2005, he has practiced in the state and federal courts of New Jersey. In October 2011, petitioner was admitted to the United States Tax Court. In total, petitioner has met the character and fitness requirements necessary to be admitted to practice law in nine jurisdictions. Petitioner rightly maintains that his rehabilitation is evident not only from the various testaments to his personal probity and contributions to society but also from his record in those jurisdictions as a practicing attorney, which has remained unblemished over several years.

Although our approval in the past was impeded by the brevity of time, a sufficient time period has now passed without incident in petitioner's life—during which he has been a practicing attorney in good standing and has contributed to society—that we are now persuaded that a change in circumstances warrants a different result.

Two character references in support of petitioner's 1995 application for admission are notable, providing a good starting point for our review of the record. John D. Feerick, formerly Dean of Fordham Law School, one of New York's most eminent attorneys and one whose name is synonymous with integrity, addressed petitioner's successful efforts to change the bylaws of the Association of the Bar of the City of New York to facilitate the admission of former felony offenders. While Dean Feerick was unfamiliar with the nature of petitioner's offenses, and petitioner's efforts obviously advanced his own interests, Dean Feerick, upon being so informed, expounded on the importance of redemption in adhering to his recommendation that petitioner's application be approved. Another reference was provided by Joseph L. Forstadt, Esq., also a prominent attorney, who knew of petitioner's ex-offender status, which, he conceded, initially caused him some concern. Significantly, he described petitioner as being candid in discussing the particulars of his crimes. Over time, he came to know petitioner on a personal level, forming a positive opinion of petitioner's moral character and fitness to practice law. Forstadt also recommended petitioner as an intern to Judge Lorin Duckman, who also testified in his support.

Several character witnesses testified for petitioner at the most recent hearing. We do not simply accept such character testimony carte blanche, and we are constrained to employ the same due circumspection accorded to any character reference offered at an applicant's request. Nevertheless, the testimony of these witnesses is characterized by a remarkable consistency on relevant points and has a compelling force, whether considered individually or in the aggregate. Notably, the character witnesses are persons of achievement with significant professional credentials who have placed their own reputations on the line by vouching for petitioner's integrity. Moreover, the subcommittee had an ample opportunity to evaluate each witness as he or she testified, to observe demeanor, to consider the possibility of undue bias and to make relevant inquiries. Therefore, we accord serious consideration to the recommendations of both the subcommittee and the full Committee.

The following character witnesses testified on behalf of petitioner in the present application.

Albert Richter, Esq., former Law Secretary to former Associate Justice John Carro of this Court, described the familiarity he developed with petitioner, whom he supervised during petitioner's two-year internship in chambers commencing in

1993. The close personal contact they have maintained since that time has provided ample opportunity to evaluate petitioner's moral character and fitness. Richter explained that while internships usually last only a single year, petitioner's diligence, productivity and personality led to an extension of his internship. Richter was well aware of petitioner's convictions, the underlying facts, his incarceration, and his postrelease activities. Richter previously testified before the Committee on petitioner's 1995 application and before the New Jersey Committee in 2005, offering his now even stronger opinion that petitioner has the character and fitness required of a practicing attorney. Richter remarked that his own career had included a stint as an attorney for the Grievance Committee, making him especially sensitive to the embarrassing possibility that a recommended attorney might act dishonorably. However, he explained that the potential for disgrace to petitioner's supporters, as well as the destruction of everything that petitioner has worked so hard to achieve should he fail, weighed heavily as factors motivating him to succeed.

Richter portrayed petitioner as having aspired to law school while being "at the bottom of the heap" while he was incarcerated, when he

> "made a firm decision . . . to become a different person, a better person, give back to society. Which he did through going to law school and a series of many generous acts . . . for which he has received awards. Throughout my many discussions with him, I have come to believe that he has as high an integrity and character as anybody I have met . . . He is a very giving and generous person. He looks out for the underdog. He empathizes with people who . . . are trying to change their lives."

Richter asserted that he would trust petitioner with his own family's finances, and found it unthinkable that he would ever act dishonestly towards a client or give less than his very best in representing a client's interests. He described petitioner, as he has come to know him over the past decade and a half, as a fundamentally different person from the young man leading a criminal life involving significant drug use in the early 1980s. Richter suggested that any remaining semblance of that earlier person likely would have manifested itself, and did not, over the prior five years that petitioner had been practicing law.

Justice Carro offered the perspective of a mentor who, as an Appellate Division jurist and later as a member of the Commit-

tee on Character and Fitness, has amassed 30 years of experience in applying the criteria for attorneys' admission to the bar. Justice Carro related that over the prior 25 years, he probably had more of an opportunity to observe and evaluate petitioner, in his individual and profession capacity, than any other lawyer with whom he had ever dealt. Justice Carro had accepted petitioner as an intern until his own retirement from the bench in 1994, had recommended petitioner to the Kings County District Attorney for a 1994 summer internship, invited petitioner to accept a position with his own newly formed law firm and maintained a social and professional relationship with petitioner thereafter.

Justice Carro testified that for several years he professionally interacted with petitioner in his law office almost daily and has consistently maintained a close personal relationship with him, including regular lunches, dinners and other social occasions. He described petitioner as intelligent, diligent and committed and, more saliently for our present interest, "of high moral character, the utmost integrity," someone he trusted and would recommend to others. Justice Carro's opinion of petitioner's moral character had actually increased since his 1995 testimony, as a result of petitioner's personal and professional conduct as well as his persistence in seeking admission to the bar when others would have long since given up. Justice Carro related that he often had accepted cases pro bono and asked petitioner for help, which petitioner had never refused. Justice Carro concluded by attesting that he recommended petitioner's character and fitness "absolutely, without any equivocation," and he would "highly endorse" his application for admission.

Roland R. Acevedo, Esq., has known petitioner as a friend and colleague for almost two decades, describing petitioner's friendship as extending to his wife and children, who regularly spend holidays with petitioner. Acevedo, who was the managing attorney for a not-for-profit organization representing HIV-positive persons with family law-related problems until the funding ran out, is now engaged in private practice. He testified that from his own lengthy and close personal knowledge of petitioner, his observations of petitioner's manner of relating to people and petitioner's pro bono services in AIDS-related cases, he would rate his moral character as a 10 on a scale of 1 to 10.

Acevedo himself had been incarcerated twice for robbery in the first degree, and in one case had also been charged with attempted murder. The armed robberies were committed in the

late 1970s and early 1980s. After being released in 1988, Acevedo attended college in the evenings, worked with the homeless during the daytime, started a Master's degree in social work, matriculated at Fordham Law School, graduated in 1996 and was admitted to the bar in 1997. Acevedo reflected that Dean Feerick had been supportive of his endeavors and likely was the reason why he was admitted to Fordham Law School. Acevedo met petitioner when Dean Haywood Burns, having been presented with petitioner's application to CUNY School of Law, asked Acevedo, in view of his own background, to review it and to form an opinion of petitioner.

Acevedo testified that he had been a drug abuser, which was connected with his crimes, and had received drug treatment. While working at the not-for-profit organization, he had been instrumental in helping to provide drug treatment for others and continues to be involved in such efforts. Acevedo characterized himself as exchanging one addiction—drugs—for another—helping people. Acevedo was aware that petitioner had undergone intensive drug treatment and therapy and likewise acquired from that experience a need to help other people.

More recently, Acevedo learned that petitioner came under psychiatric care, taking prescribed medication for mood stabilization, but he described petitioner's personality as essentially consistent. From his experience, Acevedo was able to spot signs of drug abuse; he had never observed any indication that petitioner presently abused drugs. Acevedo, knowing the basic facts about petitioner's convictions, characterized him as being tougher on himself than most people are and as regularly expressing his need to make amends. Acevedo conceded that while no one can predict the future, from his own experience he considered himself to be a good judge of character and the likelihood of recidivism. He testified that "with no hesitation, I know [petitioner] is never going down that path again, and I think his behavior shows that."

Margaret Mayora, Esq., a regulatory energy attorney, testified that she has been acquainted with petitioner since 2002. She was familiar with his criminal past and, indeed, first became aware of him through someone he had dated during that time period. She came to rely on petitioner while she was pursuing a career as a solo practitioner because she was unfamiliar with civil litigation. Petitioner was readily available to help her, without compensation, even serving as lead counsel on a federal sexual harassment case. Mayora observed his influential interac-

tion with that client, who obviously reposed her trust in him, as well as with fellow attorneys, whom he always treated with courtesy and respect. She had no concerns about petitioner handling client funds, noting that although he had several pro bono clients, he also had paying clients, and did not appear to live above his means. With her 16 years of experience dealing with fellow attorneys, she rated petitioner very highly in terms of professionalism, civility and ethics.

Mayora remarked that she was aware that petitioner had done "terrible things" in his past. They had had numerous discussions about them, and she wanted to underscore her impression that he was very remorseful, very contrite, that he manifested this with his dedication and professionalism and a thoroughness in his work product that she had not observed in other lawyers. Mayora offered as an example of his diligence that when she walks her dog at night, she regularly sees his office light on, and his silhouette, at close to midnight. She also related that he adheres to certain rules of practice, one of which is being consistently well prepared, and another punctuality, to the point that he insists on being early for appointments in the event that some unanticipated contingency might arise. In conversations, petitioner observed ethical lapses by other attorneys that he predicted would lead to bad outcomes, about which he was often correct. She testified that she had been in numerous social gatherings with petitioner and had never seen him intoxicated. Mayora characterized petitioner as a good person, genuine and caring, and attested to his moral character without reservation.

Sherry Bokser, Esq., who was senior counsel for the United Federation of Teachers, testified in like vein. Much of her testimony—positively relating how petitioner helped her on various cases, his commitment to clients, her trust in him and the like—replicates testimony already offered and need not be elaborated upon. Bokser testified that she had never known or observed petitioner to be violent. Under questioning from the subcommittee, she testified that petitioner never tried to justify his conduct as to his two criminal convictions but, rather, accepted responsibility for his actions.

Joshua Kamens, Esq., an attorney for the Treasury Department who is a graduate of the University of Pennsylvania, the Wharton School and Fordham Law School, and received an LL.M. from NYU, flew back from a business trip to India early in order to attend the hearing. Kamens, too, testified to his

friendship of several years with petitioner, petitioner's candor about his criminal past, his exceptional diligence in client maters, and his ethical rigor. Kamens related that petitioner's ethical advice had helped Kamens avoid legal grey areas when involved in an international trade business. On one such occasion, it cost him a client, but he was glad he had taken petitioner's advice. He testified that it was hard to reconcile petitioner's former life, as it had been candidly described to him, with the person whom he came to know. Kamens testified that petitioner never tried to justify his past actions, expressed considerable remorse, and "it is something I think he lives with every day of his life in one manner or another."

Ariyike Diggs, Esq., who received a law degree from Oxford University and an LL.M. from the University of Pennsylvania, testified on petitioner's behalf for his admission to the New Jersey bar. She first met petitioner in 1996 and has been close friends with him ever since. She described petitioner as "one of the most truthful people that I know." She testified that she had been dishonest on a nonprofessional matter in 2000 and sought petitioner's counsel, and that he was one of the few people who urged her to be truthful, notwithstanding the painful consequences.

Diggs, too, ranked petitioner as a 10 on a 1-to-10 scale of integrity, honesty, civility and his dealings with other attorneys. She testified that aside from his professional ability, she did not know anyone more thoughtful, diligent or risk-averse than petitioner.

The subcommittee was impressed by the openness and demeanor of the witnesses, finding them to be completely credible and concluding that their testimony had not been tilted in petitioner's favor by their affection for and loyalty to him. The subcommittee also pointed out that no witness had ever observed petitioner taking illegal drugs, nor had they discerned any indication of petitioner having done so.

Petitioner's testimony covered much of the same ground already covered in his prior application, including his inability, as an ex-offender, to find work. His participation in volunteer civic activities and pro bono work, reflective of his contribution to the community, merits mention. While in CUNY Law School, he made the acquaintance of Dean Haywood Burns as a result of his participation in several programs. Notably, petitioner established the Ex-Offenders Law Students Association, which worked towards helping probationers and other former offend-

ers. These efforts included arranging for the Department of Probation to send probationers to the law school to undertake clerical jobs while on probation, helping probationers obtain GEDs and providing tutoring to that end, and assisting their attempts to enter college. Petitioner helped to establish a program at CUNY Law School for mentoring underprivileged foster children from diverse backgrounds and encouraging them to complete their education. He also participated in a program to teach students from a local public school weekly classes at the law school and a counseling program in which law students encouraged incarcerated offenders to turn their lives around. After graduating from law school, petitioner worked on numerous pro bono cases for former Justice Carro in his practice. Petitioner's testimony regarding his continuous acceptance of cases without compensation was entirely consistent with the testimony of the witnesses.

The amount of time during which petitioner has been beneficially engaged in his profession, including pro bono and community work, coupled with the persuasive and often heartfelt testimony of witnesses who have developed a deep familiarity with him—some of whom by experience and training are well equipped to scrutinize his personal development—persuade us of the success of his rehabilitation. It is telling that petitioner's character references hailed from respected positions of advanced achievement and, themselves, enjoy reputations for high moral character. While readily conceding that this Court cannot foretell the future, we return to the earlier observation made that we cannot reach into the internal workings of petitioner's mind to gauge his character, but must generally rely on his conduct as an accurate manifestation thereof. Crediting his witnesses and taking into account his postrelease conduct and achievements, the manner in which he makes himself available to help individuals and his contributions to the betterment of society—matters to which all witnesses have attested—as well as the absence of conduct contrary to the ethics governing the legal profession over an extensive period of time, it is manifest that petitioner has rehabilitated himself to such an extent that he satisfies the character and fitness requirement set forth in Judiciary Law § 90.

Further, petitioner's expressions of remorse, which are both extensive and have the ring of candor, were consistently corroborated by the testimony of the witnesses. Petitioner's memories and perceptions of his actions and motivations on the night

he fired shots towards his fleeing former girlfriend, remain consistent with his earlier testimony that he did not intend to hurt and shoot her. The subcommittee elicited that petitioner at that stage in his life was constantly intoxicated by drug use, primarily amphetamines and Quaaludes, and he had taken an entire bottle of 30 prescription pills (Tenuate Dospan) on the day in question. This was not a drug he was accustomed to taking, and the effect on him was unfamiliar. He described himself as "super-wired," and appreciated how this might have frightened his former girlfriend. However, at no time did petitioner try to justify his actions as being the consequence of intoxication; rather, it was the subcommittee that elicited this contextual information. Although petitioner recalled what he perceived to be his intent, his memory was blurred as to many events of the evening.

The subcommittee, having had the opportunity to scrutinize petitioner's demeanor during his testimony and to examine him, summarized in its report that petitioner was "stoned" on drugs at the time, that he was not being intentionally untruthful in his characterization of the events of that evening as he recalled them, and that, at the time of the incident, he was obviously in a highly agitated state, enhanced by the drugs he had taken. Significantly, the record also reflects that there is not one scintilla of evidence that he acted violently or even recklessly with attendant violent result on any other occasion. All witnesses, to the contrary, describe a peaceful and considerate, if hyperactive, person. The subcommittee concluded that petitioner "expressed palpable remorse for his past criminal conduct" and that his "present respect and passion for the law were abundantly obvious from his testimony."

Based on this record, the dissent nevertheless would impose on this particular petitioner a threshold for moral character that suggests an endless quest in which petitioner will never succeed. The dissent, although casting its net wide in reviewing how moral character has been variously defined, appears to employ a much narrower standard as it drills down decades into the past to give new life to 30-year-old crimes to conclude that petitioner has not fully accounted for that past and, thus, lacks candor. The dissent devotes a substantial portion of its writing to extensively detailing petitioner's prior illegal conduct surrounding the detention and shooting incident involving his former girlfriend, in effect, trying petitioner all over again for the crime of attempted murder and related counts committed well

past a quarter of a century ago; but for which petitioner had pleaded guilty and served time for these crimes ages ago. Moreover, the dissent's conclusion that petitioner has started the journey towards rehabilitation but is "not there yet," begs the question: how is petitioner to get "there." In the dissent's formulation, it seems that petitioner must testify that he intended to kill his former girlfriend and shot at her, fortuitously missing, in furtherance of that intent. However, petitioner's consistent testimony has been to the contrary. Perhaps his drug intoxication at the time confused his motives as well as his memory, or perhaps he sincerely believes that the way he remembers the event is the truth. Perhaps, in fact, it is the truth. We really cannot know. However, with respect to what petitioner truly believes, this Court cannot ignore that his sheer doggedness in adhering to his earlier, somewhat muddled, explanation has likely not helped him over the past many years during which he has sought admission. Yet, there was little incentive for petitioner to testify that he lacked culpable intent, especially since he was already convicted of attempted murder in the second degree, on a plea of guilty, even if it was an *Alford* plea. Although the dissent dismisses our review of the testimony as paying mere "lip service" to candor, to the contrary, we have carefully evaluated petitioner's candor without resorting to any preconceived assumptions. In the final analysis, the dissent seems to be speculating about petitioner's mind set, and to get "there," it seems that petitioner would have to change his testimony to conform to the dissent's expectations. However, we cannot rest our analysis on the dissent's preferred outcome. The dissent characterizes our finding as a "whitewash," but, as is evident in our analysis and discussion above, we have scrutinized an extensive record to arrive at what we find to be an appropriate and just result.

The dissent is grasping at straws in focusing on an emotional reaction at one point by petitioner in support of its finding of his sense of entitlement and a lack of sincerity. The transcript does not support the dissent's conjecture. At the end of a day of testimony, after all of his witnesses had concluded their testimony, a subcommittee member asked again whether petitioner felt remorse for the incident involving shots fired towards his former girlfriend. Petitioner, noting that he was almost in tears, protested that after all of the testimony thus far, it was "insulting" for his feelings of remorse to be doubted. Perhaps petitioner interpreted the question to imply a rejection

of the witnesses' testimony regarding his many expressions of regret over the years, or perhaps he was merely overreacting to a painful subject. We do not know. However, to the extent that the dissent finds this single passage to be fatally revealing, we simply disagree, as even the members of the subcommittee considered it to be an emotional reaction, ultimately of no consequence. Notably, the subcommittee members characterized the moment in emotional terms, expressed their understanding that petitioner was too emotionally involved in this application, and encouraged him to consider being represented by counsel for his testimony on the next hearing date. Petitioner took that advice, and thereafter, was represented by Diggs. The brief incident passed with no further ramifications.

Finally, we sharply dispute the dissent's use of another device in its apparent attempt to divert the analysis from the recent past to the very distant past. In this instance, the dissent's goal seems to be closer to an unsubstantiated assault on petitioner's character, rather than an objective review of actual character evidence. Petitioner's former girlfriend's testimony from the 1985 Staten Island trial as to which the original judgment of conviction was reversed and, with defendant's plea, the charges were not re-tried, is an unreliable basis for reaching conclusions in this case. The dissent nevertheless, selects from the complainant's cross examination testimony a reference to petitioner allegedly drugging and branding her during the course of their relationship. The questioning arose in the context of her description of petitioner's alleged sexual proclivities, on a single occasion, during their relationship, although her memory was inexact as to when in mid-1982 this incident occurred. However, she also testified that she lived with petitioner during the time of this alleged "extremely horrendous" incident but choose not to move out until almost a year later, on March 15, 1983. She was also evasive when asked if she resumed working for petitioner after the alleged branding incident, and she repeatedly stated she could not recall. Yet, she testified that the alleged incident occurred in "March, April, May, [1982] something like that,'' and in her earlier testimony, she worked for petitioner in June 1982. Although the girlfriend testified that she was "branded'' during some form of sexual activity after being forcibly administered an unspecified drug, no other details were provided. Yet the dissent volunteers its own narrative, that is, "a mark was burned into her skin with a hot branding iron.'' There is no such testimony in the record, and the circum-

stances surrounding this incident are unknown. For all we know, it could have been a tattoo placed on the girlfriend. We just do not know. What is clear, however, is that the girlfriend made no complaint concerning this incident, never alleged that her relationship with petitioner was abusive and thereafter continued to live with him for a significant period of time and possibly continued her employment with him. We have no reliable means of gauging whether that act ever occurred since, as noted, the testimony was elicited by defendant's counsel on cross examination, it was not pursued further at trial, and there is no other support for the allusion to branding.

Of course, this is not a proceeding in which we employ a *Molineux* (*People v Molineux*, 168 NY 264 [1901]) analysis, but the underlying caution operating in *Molineux* jurisprudence, even if entirely nonbinding on our analysis in a bar admission case, nevertheless may have some value here: petitioner was not arrested nor charged with the alleged conduct, which allegedly occurred during a different time period from the shooting incident, was unrelated to the charges against petitioner, and arose in an interpersonal context unrelated to those charges. Moreover, the complainant, who necessarily was an interested witness at the criminal trial, never took steps to document any complaint of such conduct, and there is no additional support for a conclusion that it occurred, so that the reference remains unreliable as evidence.

The dissent, in this application for admission to the bar, has, yet again, totally disregarded petitioner's extensive rehabilitative efforts and accomplishments during the 22 years since his release from incarceration and seems determined to try, or retry, petitioner for events, and even possible nonevents, that occurred decades in the past. Although we cannot categorically reject the occurrence, we simply do not have any basis to know whether it occurred, and the dissent, too, lacks any basis to assume that it happened, as described. However, the dissent seems intent on grasping at yet another straw, this time to portray petitioner as sadistic and violent. Yet, tellingly, there is no indication in the extensive record before us that petitioner has violent tendencies, other than the evidence addressing the night of the shooting which, itself, explains the lengthy duration of this case. The dissent also charges petitioner with domestic violence. By tying the complainant in the attempted murder case—who no longer had a relationship with petitioner—to a victim of domestic violence, the dissent is conflating different issues. The ex-

girlfriend was a victim of attempted murder which petitioner was charged and tried. There was no charge or trial relating to the alleged and entirely undefined, "branding." The dissent's assertion that the jury returned a verdict based on the uncharged "branding" incident, is either disingenuous, or an attempt to skew the record, and, in either event, is entirely speculative and unsupportable.

Moreover, the impropriety of the dissent's strategy is found not only in the improper use of the reference to branding but, more egregiously, in a footnote that impliedly links the unreliable reference to gang activity—with not one iota of evidence, nor even the existence of hearsay, with all of its unreliability, that any gang activity is even in the picture. Petitioner was once a successful operator of an illegal enterprise that sold Quaaludes, not a gang thug. Nevertheless, in a landscape of petitioner's life that has been viewed time and time again, the dissent now seems determined to forcibly sketch in new details that simply do not fit. A second footnote reference in the dissent is drawn from Wikipedia; as of yet, Wikipedia is not recognized source material for serious jurisprudential analysis. In any event, the second footnote links branding to slavery. The point of this footnote reference is simply beyond our comprehension, unless the dissent, for some reason, is trying to inject race into a manifestly nonracial case. The dissent's overall goal seems to be that of molding any reader's understanding of the case in an unjustifiably prejudicial manner. We prefer to adhere to the record.

We conclude that there is no sound basis to further impede petitioner's quest to be admitted to the bar in the jurisdiction where, in an earlier life, he violated the law. Petitioner has sufficiently shown that he possesses the requisite character and fitness for admission to the bar, and we join other jurisdictions that have admitted petitioner to practice.

SAXE, J. (dissenting). On the surface, Neal E. Wiesner (petitioner) offers much to recommend him for admission to the bar of the State of New York. Although a convicted felon, once he completed serving a mandated prison term in 1990, he received an undergraduate college degree, then studied law and passed the New York State bar examination. While he was not granted admission to the bar of this state, he was admitted to the New Jersey bar in June 2005 and to the federal bar in the District of New Jersey, and then the New York Federal District Court and Circuit Court bars shortly afterward. Since then, he

has practiced law with an unblemished record in those jurisdictions. These facts certainly tend to establish petitioner's intelligence and his competence. But, they do not establish that he has the requisite moral character for admission to the bar.

This application, then, requires us to consider how a person who has been convicted of attempted murder as well as illegal trafficking of prescription narcotics can successfully establish that he possesses the moral character necessary to be admitted to practice law in New York. Based on my analysis of the record, there remains a gaping hole to be filled before petitioner has provided the necessary demonstration of good moral character. I therefore dissent and would deny the petition for admission.

There is no right to be admitted to the bar of this state. Graduating from law school and passing the bar examination do not entitle a person to admission. Membership in the bar is limited to persons who are of good moral character, and it is this Court's obligation to act as the gatekeeper, determining whether the applicant "possesses the character and general fitness requisite for an attorney and counsellor-at-law" (Judiciary Law § 90 [1] [a]; *see Matter of Portnick*, 5 AD2d 16 [1st Dept 1957]). Even applicants who do not have a history of criminal convictions must demonstrate that they are of good moral character. As Chief Judge Benjamin N. Cardozo once said, "Membership in the bar is a privilege burdened with conditions. A fair private and professional character is one of them" (*Matter of Rouss*, 221 NY 81, 84 [1917], *cert denied* 246 US 661 [1918]).

Nor can the task of assessing an applicant's character be accomplished by adopting another jurisdiction's assessment; we may not cede that responsibility to any other authority. For us to arrive at a determination regarding whether an applicant with a criminal history possesses the requisite moral character and fitness to be permitted to practice law in this state, it is necessary to fully review the applicant's conduct—both the crimes themselves and his subsequent actions and activities.

One of petitioner's two criminal convictions arose out of a drug distribution scheme that he operated for more than two years. From 1980, when he was 27 years of age, to 1982, he operated five "insomnia clinics," ostensibly for sleep disorders, through which he paid licensed doctors up to $3,000 per day to provide individuals who presented themselves at one of his clinics with prescriptions for Quaaludes (Methaqualone), at that time a schedule II controlled substance. These individuals would

pay the clinic a fee of $150 to $200 per visit, and would receive prescriptions upon stating to the doctor that they were unable to sleep; however, the patients were actually purchasing the drug for recreational use. This business continued until the execution of a search warrant at his office in May 1982, although no arrest or indictment occurred at that time. Soon after that, though, Quaaludes ceased to be manufactured, effectively making any further operation impossible. Petitioner was arrested in December 1984, and in 1987 he pleaded guilty to conspiracy to violate federal narcotics laws and to distribution and possession of Quaaludes, and was sentenced to time served.

Petitioner stated in the course of earlier proceedings that he had been advised by counsel at the time that this drug distribution scheme was lawful, as long as the doctors used their own judgment in deciding whether to provide a prescription. He more recently acknowledged, however, that these advisors, who themselves earned money from his enterprise, were not objectively informing him of the applicable law, but instead, were telling him what he wanted to hear.

According to more than one of petitioner's character witnesses, petitioner had reported to them that, at its peak, this drug distribution enterprise could take in up to approximately $20,000 per day, and that all together he had earned approximately $1 million from it. Petitioner himself testified that he could not provide exact figures, but he acknowledged that the business had earned him hundreds of thousands of dollars. He did not know whether his personal earnings had been reported to the Internal Revenue Service.

The other crime of which petitioner stands convicted, attempted murder in the second degree, arises out of events that occurred on July 13, 1983, a few months before his 30th birthday. According to his testimony before the subcommittee, he had ingested an extraordinary amount of amphetamines that day, and he was feeling despondent because he was contemplating his anticipated prosecution for drug trafficking, because he no longer had the social connections he had when he was running his drug sales operation, and because he was separated from his girlfriend, which separation he incorrectly believed was prompted by her need to disassociate herself from the anticipated prosecution, rather than by any negative feelings toward him. He had obtained a gun from a friend (unbeknownst to the friend) with the idea that he would use it to commit suicide, but he wanted to see his girlfriend first. He called her and asked

her to meet him. When she declined, saying she was not ready to see him yet, he pressed her, explaining that they needed to exchange each other's keys and other possessions. She acceded to that request, and brought his things to the place where they arranged to meet, but once there he said, "I have to talk to you." When she hesitated, he showed her the gun in his pocket, saying again, "I've got to talk to you," and she went with him. They walked around, then went back to her apartment, where they remained until 1:30 or 2:00 A.M. At that point, petitioner's girlfriend departed by jumping from her second-story window, an inexplicable method of egress that he never fully explained. Petitioner then used the borrowed gun to fire five shots out the window, although he expressly denied shooting at her. He then ran down the stairs after her, where he discovered that she had flagged down a car, the occupants of which told him she was hurt and that she was afraid of him. He urged them to take her to the hospital, and when they did not, he called 911 for an ambulance. Later that night, he was arrested.

Of course, petitioner's narrative does not support his conviction for attempted murder in the second degree (see People v Wiesner, 129 AD2d 753 [1987], lv denied 70 NY2d 658 [1987], lv dismissed 71 NY2d 1034 [1988]), which was subsequently vacated pursuant to a grant of a petition for a writ of habeas corpus (see Wiesner v Abrams, 726 F Supp 912 [ED NY 1989], affd 909 F2d 1473 [1990]). It was the narrative provided at trial by his ex-girlfriend that formed the primary factual basis for his first conviction.

The subcommittees of the Departmental Disciplinary Committee that conducted the 1995 and 2010 hearings regarding petitioner's applications for admission to the bar, did not quote from or directly discuss the testimony of petitioner's ex-girlfriend at his 1985 trial. In the 1995 subcommittee report, those facts are provided through the quotation of Judge Dearie's summary in his decision granting petitioner habeas corpus relief (see Wiesner v Abrams, 726 F Supp 912 [1989], supra), which petitioner conceded accurately summarized the girlfriend's testimony; the 2010 subcommittee report seems to have paraphrased Judge Dearie's summary. That summary reads as follows:

> "According to [petitioner's ex-girlfriend], the pair met at the Clifton train station of the Staten Island Rapid Transit at 7 P.M. and commenced what for her became a night of terror. Petitioner pointed a

gun at her, threatened her, led her to a pier, and ultimately forced her to her apartment, where he, still armed, held her against her will for over seven hours.

"In a desperate attempt to escape, [she] jumped from the window of her second story apartment to the sidewalk below. As she fled, petitioner fired several shots—five or six in all—in her direction. None of the bullets hit [her]. As a result of the jump, however, she sustained fractures in both her heels, tore cartilage in her chest, and injured the platebone in her back" (*id.* at 913-914).

However, the actual trial testimony of petitioner's ex-girlfriend conveys far more fully her harrowing experience of that night, and includes details that fully justify the jury's decision to convict him.[1]

In her January 1985 trial testimony, she explained that she originally met petitioner when she was hired as an office assistant for his Quaaludes-distribution enterprise, and then became romantically involved with him. She lived with him from December 1981 until March 15, 1983, when she moved into her own apartment on Staten Island.

On the days immediately preceding the events in question, petitioner began a pattern of persistently calling her and demanding that she meet with him. On July 8, 1983, he repeatedly called her at work, asking to see her on the weekend of her birthday, July 10th, and she repeatedly declined. Yet, on the evening of July 10th, he called her at her apartment from the nearby ferry terminal, crying and becoming extremely agitated when she refused to see him, until she finally relented, saying she would meet him at the train platform. She characterized their meeting as unhappy, and said that when she attempted to

---

1. This Court obtained those trial minutes and other evidence from the 1985 trial as a court record from Supreme Court, Richmond County, although those materials were not included in the evidence before the subcommittee. Rather, the subcommittee limited itself to petitioner's version of those events, and to Judge Dearie's summary of the trial testimony. In limiting itself this way, the subcommittee failed to obtain a complete picture of the nature and extent of petitioner's character as it existed in 1983. Because an accurate understanding of petitioner's former bad acts is crucial to determining whether he is currently fully rehabilitated, I maintain that this 1985 trial evidence is necessary to a determination that petitioner currently possesses the requisite good character and should have been considered. (Additional discussion regarding the propriety of considering that evidence in this context may be found *infra*).

leave, he grabbed her hand, physically preventing her from leaving for several long minutes. Again on July 12th, he repeatedly called her at work, asking that she meet him for lunch. When she persisted in declining his invitations and ended the telephone calls, he called right back. Finally realizing that he would only stop calling if she agreed to meet him, she met him for lunch. They argued through most of the lunch, and when she walked back to work, he followed her until she reached the door to her office and asked him to leave.

On July 13th, he employed the same technique, repeatedly calling back when she refused to meet him. When he finally used a calm tone to say that he had some of her mail and a key to her apartment to return to her, she agreed to meet him at 7:00 on the platform of the Staten Island Railway's Clifton station near her apartment. He was there when she arrived, and he handed over some mail and a key, but when she started to leave he said he really wanted to talk. At his request, she went with him to a more secluded part of the station, where they sat on some steps. After a few minutes of talking, he said to her, "I think I am going to kill you," and took a gun out of his pocket. She asked him "Why," and he replied, "Well, that's what I want to talk to you about. I want to tell you why."

Believing that he would not hesitate to shoot if she tried to leave—a belief that later events proved to be well-founded—she made no attempt to walk or run away. He said he wanted to take her down to the abandoned piers in the Clifton waterfront, and although she said she did not want to go there, he held on to her right arm with his left hand, while the gun was in his right hand, and led her out of the station. Fearful of the piers, where she would be unlikely to find help, she asked if they could sit down on the curb, and he agreed. But when a car passed, he got nervous and agitated, and told her that if she tried to escape he would shoot immediately. He then took her to the pier in the area near the Verrazano-Narrows Bridge.

In what she characterized as a rambling conversation, he told her he had taken the gun from his friend, John McNally, a former police officer working as a private investigator. He also said he had been waiting on her corner the night before, with a knife, waiting for her to come home, but then he thought that would be too messy, and that he could always throw a Molotov cocktail through her window, but then he decided to get the gun. She asked why he wanted to do this to her, and he said he had given a lot of thought to where the bullet was going to go,

and he thought she could help him by telling him where to shoot her. He also said he had considered just maiming her so that she would know he loved her no matter what she looked like.

When it got dark and began to become cold, they left the pier. Petitioner told her, more than once, that he had handcuffs and wanted to handcuff her to him and then put both of their hands in his pocket, showing her the handcuffs, but she talked him out of that idea each time, saying, "You already told me you'd kill me if I tried to run. You don't need to handcuff me."

He decided, against her express wishes, that they should go back to her apartment, and as they walked there he warned her not to make any motion or signal when they passed her neighbors, so she did not speak as she passed people sitting on the stoop outside her building. When they got inside her apartment, he removed the key from the inside key-operated lock after locking the door, and placed the key in a pitcher on top of the refrigerator, preventing any possibility of her sneaking out the door.

During the hours that followed, he kept the gun either in his hand or next to him and watched her very closely, going with her when she went to the bathroom. When the telephone rang he unplugged it. Over this time, he did most of the talking on many topics, including his intent to kill her. All the while she considered possible means of escape. Her second floor living room window was open and there was no screen in it, so she began to think about escaping that way. After approximately five hours, at about 2:00 A.M., the opportunity presented itself. He again accompanied her to the bathroom, and after she finished using the toilet, he proceeded to use the toilet; in the moment when his back was to her and his gun was in his pocket, she ran out of the bathroom, down the hall and through the living room and leapt over the window ledge to the street below.

She landed on the street and began to run to the corner, thinking that the corner bar might still contain some customers. After perhaps two strides, petitioner began shooting from the window. Bullets seemed to be coming down around her, so she ran across the street and crouched in front of a parked car and looked at the apartment window, where she observed him fire another shot in her direction. When he left the window, she knew he would be coming downstairs, but realizing that it would take a few extra moments for him to retrieve the keys and find the right one to unlock the door, she took the opportunity to

run around the corner and pound on the closed door of the bar, yelling, but to no avail. When she saw a car on the street, she went and stood in the middle of its path to force it to stop for her. Although its occupants seemed reluctant to help, when the driver got out to look for help, she lay down in its back seat. She saw petitioner arriving at the corner, and heard him making calls from the pay telephone there, but then an ambulance flagged down by the driver of the stopped car took her on and brought her to the hospital.

In the jump from the second floor, she fractured her left heel and completely broke off her right heel, which became embedded in her calf and had to be surgically restored, a process requiring several surgeries. She also incurred injuries in her back and chest.

The officer who arrived at the scene and arrested petitioner found a handcuff key and the keys to his ex-girlfriend's apartment in his possession, and found five spent rounds in the area outside her building. Inside her apartment, he found two sets of handcuffs. Finally, after allowing two private investigators who were friends of petitioner to speak with him, the officer was given a hand-drawn diagram indicating the location at which petitioner had secreted the gun he had used. The officer proceeded to the indicated street corner and retrieved the gun, which was found to contain one live round.

Also submitted in evidence was the note petitioner wrote to his friend John McNally when he took McNally's gun without permission. The note creates further reason to doubt petitioner's claim that he was planning suicide. It says,

> "I'm borrowing something from you. I never would take something from someone without asking—least of all from you—but I'm taking the chance that you won't mind. It seems to me like the kind of thing you'd understand under the circumstances. I'll return it in a day or two."

Another piece of disturbing information about petitioner emerged during cross-examination of petitioner's ex-girlfriend by his assigned trial counsel.[2] In the course of attempting to impeach her credibility by asking about her drug use and sexual

---

**2.** Among petitioner's many complaints to the trial court just before trial began was his protest that his new trial attorney had only met with him on that day; yet, counsel's use of information that could only have come from petitioner indicates that lawyer and client were able to engage in appropriate pretrial discussions.

history, petitioner's attorney elicited from her that some time in the middle of 1982, petitioner forcibly gave her a drug and then forcibly branded her—that is, presumably, a mark was burned into her skin with a hot branding iron (*see* The New Oxford American Dictionary 206 [2d ed 2005])[3]— an event she characterized as "extremely horrendous." Counsel focused on her uncertainty about when this event occurred, and whether it took place while she was still employed by petitioner, so as to call into question whether it was indeed horrendous and to suggest that she actually consented to it. But, ultimately, that impeachment did nothing to undermine her claim that petitioner forcibly branded her, without her consent and against her wishes. Except for her testimony during her direct examination that her intimate relationship with petitioner ended primarily due to petitioner's "taste for sadistic and violent acts during sex that [she] didn't share," nothing else in the testimony explained the nature of the branding. Of course, this information—which was raised by petitioner's *defense counsel*, not petitioner's ex-girlfriend—was not the subject of a criminal complaint or any charges. Nevertheless, it is still some evidence relevant to petitioner's character. Since the application before us is not a criminal prosecution, the rule of *People v Molineux* (168 NY 264 [1901]), which precludes evidence of uncharged crimes "where its only relevance is to show [a] defendant's bad character or criminal propensity" (*People v Agina*, 18 NY3d 600, 603 [2012]), is inapplicable. The issue of petitioner's bad character is of utmost relevance in this proceeding. Therefore, his ex-girlfriend's troubling testimony that such conduct was forcibly imposed on her may be considered with respect to petitioner's character.

At the 1985 criminal trial, petitioner did not offer as a defense that, in his mind, his ex-girlfriend had remained with him voluntarily, out of concern that he might commit suicide, and that he never intended to shoot her. Rather, he demanded that the trial be delayed, claiming that impeaching the credibility of certain witnesses against him in the state case would hamper his defense of the federal drug case. When that effort failed, in apparent protest against the supposed failings of his assigned

---

**3.** According to Wikipedia, the historical practice of human branding to mark slaves, prisoners or convicts has been widely abandoned as inhumane, but remains in current use by some street gangs, college fraternities, and among some sadomasochists (*see* Wikipedia, Human Branding, http:// en.wikipedia.org/wiki/Human_branding [accessed Feb. 16, 2012]).

counsel and the trial judge's denial of his ambiguous application to proceed pro se, he refused to allow his counsel to cross-examine witnesses, and he did not testify or present other defense witnesses. Unsurprisingly, the jury convicted him of attempted murder in the second degree, burglary in the first degree, unlawful imprisonment in the first degree, criminal possession of a weapon in the second degree, and criminal use of a firearm in the first degree, and he was sentenced to a prison term of 12¹/₂ to 25 years, which conviction was affirmed on direct appeal (*People v Wiesner*, 129 AD2d 753 [1987], *supra*).

However, this conviction was vacated when District Court Judge Dearie granted a writ of habeas corpus, on the ground that petitioner was denied his constitutional right to represent himself at trial (*Wiesner v Abrams*, 726 F Supp 912 [ED NY 1989], *supra*). Although on direct appeal the Second Department upheld the trial court's denial of petitioner's request to proceed pro se, because petitioner had acknowledged that he was incompetent to act as his own attorney and because it viewed the request as "a calculated effort to further delay the proceedings" (129 AD2d at 754), Judge Dearie found that this conclusion was not fairly supported by the record (726 F Supp at 921 n 4).

In view of the calculated risk petitioner took by undermining his own defense in protest, and his transparent efforts to set up appellate issues as he interfered with the trial process, Judge Dearie's determination may be surprising to some. It is more important to note, though, that it served to give petitioner his first big break.

When the matter was returned to the trial court for retrial, petitioner had already served over five years of his term, and he was offered a plea to attempted murder with a sentence of 2 to 6 years. Although there is no explanation in the record for the decision not to retry him, petitioner testified at the 2010 hearing before the subcommittee that he had heard from others that his ex-girlfriend was afraid of him and remained in hiding in California. It seems that her fear resulted in petitioner's second big break. While he refused a proposed plea that would require him to allocute to intentionally shooting at his ex-girlfriend, because he insisted that he never harbored that intent, it was likely her unwillingness to return to New York to testify against petitioner again that prompted the People to offer the plea he

ultimately accepted—an *Alford-Serrano* plea[4] to the charge of attempted murder, which allowed him to accept the conviction to the charge while not acknowledging his guilt and was based on the recognition of the significant possibility of a conviction and severe sentence after trial. He was sentenced to a term of 2 to 6 years, and was released from custody based on the time he had already served.

Following his release, petitioner completed his college degree, and, with the backing of United States District Court Senior Judge Gerard L. Goettel, who had presided over his drug case, petitioner was admitted to and attended the CUNY School of Law beginning in the fall of 1991. While he was a law student, he obtained several intern positions with the assistance of some distinguished and high-powered individuals. First, with a reference from Joseph L. Forstadt, a former colleague of his father, he found work as a summer intern for Criminal Court Judge Lorin Duckman in the summer of 1992. Then, with the backing of CUNY School of Law's Dean, Haywood Burns, he was taken on as an intern by Justice John Carro of this Court during his second and third years of law school. Finally, on the reference of Justice Carro, he was accepted as an intern with the Kings County District Attorney's Office of Charles Hynes during the summer of 1993. Upon graduating in May 1994 and passing the July 1994 bar examination in November 1994, he continued to receive work as a law graduate and as a paralegal from the law firm in which Justice Carro, who had retired from the Appellate Division, First Department, was then practicing law, and from other law offices.

In his applications for bar admission, petitioner has disputed the facts as testified to by his ex-girlfriend, to the extent of protesting that *at that time*, he did not understand that she thought he was threatening her when he displayed the gun. He has said that at the time, he did not realize that she remained with him in her apartment under threat that he would shoot her, or that she thought he was shooting at her after she jumped from the window. He has asserted, and continues to assert, that at the time he believed her to be staying with him voluntarily, and that when he fired the gun, he was not shooting in her

4. "The Alford plea gives defendants another way to plead guilty without admitting guilt," where there is substantial evidence of guilt (*see* Bibas, *Harmonizing Substantive-Criminal-Law Values and Criminal Procedure: The Case of Alford and Nolo Contendere Pleas*, 88 Cornell L Rev 1361, 1372 [July 2003]; *North Carolina v Alford*, 400 US 25 [1970]).

direction, and never intended to hurt her, but wanted only to scare her so she would not alert the police, who would prevent his intended suicide. Of course, in doing so, he neglects to acknowledge that which he cannot explain away, such as the testimony that he put the front door key in the vase to prevent her from leaving, which testimony is buttressed by her desperate act of jumping from her second-story window rather than leaving by the front door.

His application for admission to the New York bar was denied after a hearing in 1995. The subcommittee's majority report pointed out that petitioner's testimony regarding his illegal drug sales enterprise was equivocal: while he acknowledged that it was not legal, he also urged that he had been misled by advice of counsel that it was legal. That report also pointed out that petitioner avoided the issue of whether he personally paid income taxes on the profits, and that only on further questioning did he admit that he did not believe he had personally filed tax returns during that time. Regarding the attempted murder conviction, the report focused on the shooting itself, specifically the glaring illogic of shooting to keep his girlfriend from preventing his intended suicide: "One wonders how her exit prevented him from carrying out his stated purpose, and why it then became necessary to shoot at her rather than at himself." It also pointed out that petitioner's response defied belief on the question of whether he sought to testify at the trial: he asserted that he had not been allowed to testify, since the trial judge "said if I said another word he would have me bound and gagged." The majority report also pointed out that most of the character witnesses did not know the nature or full extent of the crimes petitioner had committed.

That report was adopted by a majority of the Committee on Character and Fitness, and this Court then denied petitioner's motion to admit him nevertheless, pursuant to 22 NYCRR 602.1 (m), in an order dated March 6, 1996. Contrary to the majority's characterization, our denial of petitioner's application was not because we "judged the passage of time to be insufficient to evaluate the success and sincerity of his rehabilitation." The bare order contained no explanation of our reasoning. However, it bears repeating that the subcommittee's majority report specifically remarked on petitioner's equivocation and illogical assertions, thus implicitly calling into question petitioner's character *at that time*.

In the 10 years that followed, petitioner made nine unsuccessful motions to this Court to renew his application for admission.

He also brought two unsuccessful federal actions against the justices of this Court who denied his application for admission (*see Wiesner v Rosenberger*, 1998 WL 695927, 1998 US Dist LEXIS 15666 [SD NY, Oct. 6, 1998, 98 Civ 1512 (HB)]; *Wiesner v Nardelli*, 2007 WL 211083, 2007 US Dist LEXIS 5801 [SD NY, Jan. 29, 2007, 06 Civ 3533 (HB)]),[5] the tenor of which suggested that he believed he was entitled to either admission to the bar or, if not, at least a full explanation of why his application was rejected.

In denying the ninth motion, this Court's March 6, 2006 order provided something of an explanation, in view of his intervening admission to the bar in other jurisdictions in 2005 and 2006. It stated,

> "Petitioner still fails to show that he meets the requisite standard of character and fitness for admission. The only changed circumstance is his admission to the bar in other jurisdictions. In light of the record established before us, that circumstance does not persuade us to rule favorably on his present application."

Regardless of the brief explanation provided in 2006, on August 19, 2009 this Court granted petitioner's tenth motion to renew his application for admission, to the extent of referring his application for investigation and hearing. It is this application that is before us, requiring us to now consider whether petitioner has established the requisite moral character to be admitted to the bar of this state.

The three-member subcommittee, based on evidence not remarkably different from that presented to the subcommittee in 1995, now recommends petitioner's admission to the bar. It gives far greater credence to the views of his character witnesses than that given in 1995, although there is not a great deal to distinguish the present character witnesses' submissions from those provided in 1995. Most importantly, it finds clear and convincing evidence of his rehabilitation, emphasizing that

---

**5.** The first of those actions, alleging a variety of constitutional infirmities, was dismissed in 1998, primarily based on application of the *Rooker-Feldman* doctrine (*Wiesner v Rosenberger*, 1998 WL 695927, *2-4, 1998 US Dist LEXIS 15666, *5-12). In 2007 the same Southern District Court Judge held that petitioner's challenge to the constitutionality of New York's regulations governing admission of attorneys and to this Court's determination was either barred by res judicata or failed to state a claim (*Wiesner v Nardelli*, 2007 WL 211083, *1, 2007 US Dist LEXIS 5801, *2).

his criminal conduct occurred in the early 1980s, and suggesting that "[h]e received severe punishment for such actions, having been incarcerated for over five years, and having had his life disrupted for many years thereafter due to his criminal record."

A majority of the full Committee on Character and Fitness has voted to confirm the subcommittee majority's report, with three members voting to deny admission, and another voting to direct a further hearing. Petitioner's underlying motion for admission is now before us for determination, and a majority of the assigned bench of this Court[6] favors his admission, emphasizing his admission to and successful practice in the New Jersey bar as well as various federal courts, and the length of time that has passed since he committed those crimes.

I respectfully dissent. In order for an applicant with such a serious criminal background to establish his current good moral character, he must establish his complete rehabilitation. For the reasons that follow, I conclude that his successful practice of law in other jurisdictions, and the passage of time, are not enough to establish petitioner's rehabilitation in the wake of his past crimes and other misconduct. The record simply fails to establish that petitioner has completed his rehabilitation.

Initially, we should consider what we mean by "good moral character." Since the term has been defined many ways, it is useful to briefly review a few definitions to establish the framework for our own understanding of good moral character.

> "The term 'good moral character' has long been used as a qualification for membership in the Bar and has served a useful purpose in this respect. However the term, by itself, is unusually ambiguous. It can be defined in an almost unlimited number of ways for any definition will necessarily reflect the attitudes, experiences, and prejudices of the definer" (*Konigsberg v State Bar of Cal.*, 353 US 252, 262-263 [1957]).

The traits comprised by the term good moral character include "honesty, trustworthiness, diligence, reliability, respect for the law, integrity, candor, discretion, observance of fiduciary duty, respect for the rights of others, fiscal responsibility, physical ability to practice law, knowledge of the law, mental and

---

**6.** The majority includes Justices Tom and Mazzarelli, who, along with myself, have been members of the bench that have until now voted to deny petitioner's applications for admission.

emotional stability, and a commitment to the judicial process" (*see* Ratcliff, Note, *The Good Character Requirement: A Proposal for a Uniform National Standard*, 36 Tulsa LJ 487, 495 [Winter 2000]; Brennan, *Defining Moral Character and Fitness*, 58 The Bar Examiner 24, 25-26 [Nov. 1989]). And, the Arizona Supreme Court cogently adds the following to the definition:

> " 'Upright character' . . . is something more than an absence of bad character. . . . It means that he . . . must have conducted himself as a man of upright character ordinarily would, should, or does. Such character expresses itself not in negatives nor in following the line of least resistance, but quite often in the will to do the unpleasant thing if it is right, and the resolve not to do the pleasant thing if it is wrong" (*Application of Walker*, 112 Ariz 134, 138, 539 P2d 891, 894 [1975], quoting *In re Farmer*, 191 NC 235, 238, 131 SE 661, 663 [1926]).

Honesty and candor, respect for and obedience to law, and respect for the rights of others, are particularly important in the present context, as is the more subtle but equally important expectation that the applicant show "the will to do the unpleasant thing if it is right, and the resolve not to do the pleasant thing if it is wrong" (*id.*).

Philosophers at least as far back as Aristotle and Socrates have discussed the difficulty of establishing that a person is truly of good moral character, since it is easier to *appear* to be of good moral character than to actually *be* of good moral character (*see generally* Ritter, *The Ethics of Moral Character Determination: An Indeterminate Ethical Reflection Upon Bar Admissions*, 39 Cal W L Rev 1, 1-5 [Fall 2002]). Good moral character is not a quality that is apparent externally; indeed, we are more likely to become acquainted with the nature of a person's character when there is a demonstration of poor moral character.

An essay by Judge Cardozo points out how those watershed moments, in which moral character is tested, arise without our noticing them: "Some little, unassuming, unobtrusive choice presents itself before us slyly and craftily, glib and insinuating, in the modest garb of innocence. To yield to its blandishments is so easy. The wrong, it seems, is venial. Only hypersensitiveness, we assure ourselves, would call it a wrong at all" (Benjamin N. Cardozo, *The Game of the Law and Its Prizes*, Law and Literature and Other Essays and Addresses, at 171 [Harcourt, Brace & Co. 1931]).

Making the choices that lead to the commission of serious crimes, such as petitioner did, is unquestionably indicative of bad moral character. Of course, the nature of the criminal conduct is important; where an applicant's past criminal conviction is for conduct that we no longer consider criminal, or even indicative of bad moral character, it should have no impact on consideration of that individual's application for admission to the bar (*see Matter of Kimball*, 33 NY2d 586 [1973]). But, in contrast, a history of convictions for robbery and murder, for example, would be likely to "operate to disqualify [an applicant], on character grounds, from being admitted to practice" (*see Matter of Roger MM.*, 96 AD2d 1133 [3d Dept 1983]). While this Court does not take the almost-absolute position that seems to be taken by the Third Department in *Roger MM. (supra)*, nevertheless an applicant with a background of serious felonies has a heavy burden to satisfy. That burden entails demonstrating rehabilitation (*see Matter of Anonymous*, 96 AD2d 815 [1st Dept 1983]; *see also In re Hamm*, 211 Ariz 458, 463-464, 123 P3d 652, 657-658 [2005], *cert denied* 547 US 1149 [2006]; *In re Adams*, 273 Ga 333, 334-335, 540 SE2d 609, 610-611 [2001]; *In re Application of Allan S.*, 282 Md 683, 690, 387 A2d 271, 275 [1978]).

Although the conviction based on the 1985 jury's verdict was vacated, and the subsequent *Alford* plea did not require petitioner to make any admissions, this should not preclude consideration of that trial testimony.[7] We may not be able to treat the ex-girlfriend's testimony and the other trial evidence as either admitted by petitioner or as absolute truths. But, neither should this evidence be ignored. While that evidence may no longer form the basis for petitioner's criminal conviction, the vacatur of the conviction did *not* render this evidence factually inaccurate. Indeed, it is far more reliable, and far more disinterested, than petitioner's own testimony before the subcommittee. By characterizing the ex-girlfriend as an "interested witness" the majority seems to be implying that the veracity of her trial testimony is in doubt—a preposterous claim. Her relationship with petitioner—and feelings about his victimization of her—may have precluded absolute objectivity, but that is true

---

7. If this Court were planning to rely on the criminal trial transcript to deny petitioner admission to the bar, it would be necessary to notify him and allow him the opportunity to respond before finally ruling on his application (*see Matter of Anonymous*, 97 NY2d 332 [2002]). But, that does not mean it is improper for us to consider it.

for every victim of domestic violence who testifies. For the majority to ignore her testimony as if it is unreliable—although that testimony was unswayed when subjected to cross-examination, and was the basis for a jury verdict against petitioner—is the very essence of blaming the victim.

It is, of course, the committee's obligation to conduct the investigation into the character and fitness of each applicant in the first instance (*see* CPLR 9401), and to decide whether to certify that the applicant is entitled to admission (CPLR 9404). However, it is this Court that has the final, nondelegable duty to ensure that all admitted attorneys possess the necessary good character (Judiciary Law § 90 [1] [a]). Our obligation is not circumscribed by statute or by implication in any way. If we are aware of important character evidence that was not included in the record on which the committee based its decision, and was therefore not considered by the committee, and if that evidence could have had a critical impact on the determination of the issue, it is our responsibility to reject the committee's certification of the applicant's good character.[8]

Petitioner's character in 1983, as reflected in his criminal conduct at that time, should be the baseline against which his claimed rehabilitation is measured in order to properly decide whether petitioner is so fundamentally changed that he currently is of good moral character. Consideration of his ex-girlfriend's unimpeached sworn testimony as to that conduct is therefore vital to a valid determination regarding his professed rehabilitation. The majority suggests that our consideration of the 1985 trial evidence constitutes "trying petitioner all over again." I maintain that in the context of an application for admission to the bar, any valid and viable evidence that calls into question the applicant's character can and should be considered, and this trial testimony is strong evidence of petitioner's bad character. Petitioner may choose to admit, explain, or dispute it, but he should not be allowed to ignore it. To the extent that the committee failed to consider this evidence, and the majority declines to acknowledge it, they are whitewashing petitioner's admission application.

---

8. In appropriate circumstances, rather than simply denying the application for admission, this Court could also direct a further hearing—as was the recommendation of one member of the committee—so that all necessary evidence may be fully considered and petitioner given the opportunity to respond to any additional evidence before a final ruling is made on the application (*see Matter of Anonymous*, 97 NY2d 332 [2002]).

Importantly, at the subcommittee hearing, petitioner admitted the essence of his alleged actions, and accepted the substance of the testimony his girlfriend gave in support of the criminal charges; he explicitly disputed only his mens rea. He even acknowledged that his girlfriend did, in fact, feel threatened by him. Even accepting, for these purposes, the premise that he had actually harbored no intent either to hold his girlfriend against her will or to shoot her, his actions still constituted serious criminal misconduct. He convinced her to meet with him through the use of false pretenses, he used duress to compel her to accompany him back to her apartment, and—despite whatever evasions or falsehoods he told himself—he pressured her to let him remain there with her for hours, under threat of violence (to either himself or her); finally, he fired a gun out the window five or six times as she fled from him through that same window. Moreover, to this date he has never explained why, if he was not preventing his ex-girlfriend from leaving, she felt it necessary to jump from a second-story window rather than leave through the door.

Even without murderous intent, his admitted actions constitute numerous crimes. In addition, even though the subcommittee failed to take note of this, it should not escape our notice that his use of the threat of violence to control and intimidate his ex-girlfriend into submission represents a classic form of domestic violence (*see e.g.* Social Services Law § 459-a). "Domestic violence is a pattern of coercive behavior that includes the physical, sexual, economic, emotional, and psychological abuse of one person by another" (Breitenbach, Note, *Battling the Threat: The Successful Prosecution of Domestic Violence after Davis v. Washington*, 71 Alb L Rev 1255, 1256 [2008], quoting Digirolamo, *Myths and Misconceptions about Domestic Violence*, 16 Pace L Rev 41, 44 [Fall 1995]). It is petitioner's admitted conduct as much as his conviction that create the need for him to demonstrate his rehabilitation.

In addition, his primary responsibility for the creation and operation of an illegal narcotics distribution ring for years adds substantially to the degree of his burden to establish his rehabilitation.

Petitioner must contend with all of the foregoing evidence of his past crimes and misconduct in establishing his present good moral character.

The central question here is how an applicant such as petitioner, with a history of serious crimes, demonstrates such

rehabilitation, so as to establish his present good moral character. It cannot be lightly accomplished; as Thomas Paine is commonly quoted as saying, "Character is much easier kept than recovered."

It should go without saying that for purposes of bar admission after committing serious crimes, simply serving the imposed sentence and refraining from committing further crimes is not enough to prove rehabilitation; nor is merely doing that which he should have done throughout life. While in some contexts an ex-criminal who has served his sentence may be viewed as having paid his debt to society, bar admission, like a number of other privileges, requires a much higher hurdle to be vaulted (see Clegg, Conway and Lee, *The Bullet and the Ballot? The Case for Felon Disenfranchisement Statutes,* 14 Am U J Gender Soc Pol'y & L 1, 23-24 [2006]). "For purposes of demonstrating rehabilitation, behavior generally expected of any citizen is not sufficient; rather, the applicant must exhibit exemplary behavior affirmatively demonstrative of sincere remorse and rehabilitation over a prolonged period of time" (Ritter, *The Ethics of Moral Character Determination: An Indeterminate Ethical Reflection Upon Bar Admissions,* 39 Cal W L Rev 1, 18 [Fall 2002]). But, as the majority acknowledges, the passage of time is not, by itself, enough to demonstrate an applicant's rehabilitation.

The concept of rehabilitation is founded on the idea that human redemption is both possible and valuable (see Hoener, *Due Process Implications of the Rehabilitation Requirement in Character and Fitness Determinations in Bar Admissions,* 29 Whittier L Rev 827, 831-832 [Summer 2008]). Application of the concept of rehabilitation to the bar applicant with a criminal history allows the applicant to establish that he regrets and has learned from his past mistakes (*id.* at 832).

A first step in establishing the recovery, or rehabilitation, of one's moral character in the wake of past misconduct, involves renouncing the past criminal conduct and expressing remorse for it (see *March v Committee of Bar Examiners,* 67 Cal 2d 718, 731-732, 433 P2d 191, 200 [1967]). However, renouncing the criminal conduct and expressing remorse, while necessary, are not sufficient. Even genuine, heartfelt expressions of remorse may be essentially selfish, grounded in regret for finding oneself in the difficult present position, rather than in sorrow for causing grief and pain to others, so the simple expression of regret or remorse must be carefully parsed.

During the course of the hearings, petitioner repeatedly stated that he felt remorse, that he recognized that his actions wronged many people, and that he wanted to apologize to the people he wronged. However, he also expressed some feelings indicating exasperation, even resentment, at being asked to demonstrate his remorse. It seemed as if he thought it should be understood, without the necessity of explicit expression. Specifically, after speaking of his disappointment at being denied admission to the bar after he had worked so hard, he added, "Even my reaction to, for instance, this notice of hearing, where you ask me to show remorse, it's an insult—excuse me, it's an insulting thing. I mean, do you think I'm not remorseful? I mean, could you really think that?"

This reaction by petitioner reflects one of the underlying problems with his applications. It is not that he has no remorse for the crimes he committed; it is that he approached these applications with a sense of entitlement. Having worked very hard to turn his life around, he seems unwilling to accept that establishing his rehabilitation might cause him to experience humiliation or emotional discomfort, by requiring him to clearly acknowledge the totality of his misconduct and to demonstrate—not merely recite—the nature and extent of his remorse. He fails to recognize that since bar admission is a privilege, not a right, an applicant with a criminal background is required to make an extraordinary showing of good moral character, including his full rehabilitation.

In my view, another important criterion for establishing rehabilitation, one which is discussed in a number of cases and articles considering applications for admission to the bar following misconduct, is whether the applicant has "genuinely accepted responsibility" for his misconduct (see In re G.W., 161 NH 401, 406, 13 A3d 194, 198 [2011]; In re Application of Wagner, 119 Ohio St 3d 280, 893 NE2d 499 [2008]; In re Wells, 815 A2d 771 [DC 2003]; Shochet v Arkansas Bd. of Law Examiners, 335 Ark 176, 979 SW2d 888 [1998]; Matter of Imperatore, 212 AD2d 278, 280 [1995]; In re Taylor, 293 Or 285, 647 P2d 462 [1982]; Hoener, 29 Whittier L Rev, at 837-844; Ritter, 39 Cal W L Rev, at 20). Where an applicant for readmission "continue[s] to dispute material facts surrounding the prior incidences of misconduct that eventually led to his disbarment," a question may legitimately be raised as to whether he could be said to have accepted full responsibility for his actions (see Shah v Mississippi Bar, 2011 WL 1797008, *4, 2011 Miss LEXIS 246, *11 [Sup Ct, May 12, 2011, Waller, Ch. J., dissenting]).

Especially where the nature of the applicant's misconduct is of the type that did grievous injury to others, establishing that one has accepted full responsibility for one's acts must require more than the mere statement "I accept full responsibility." It must entail fully acknowledging the nature and extent of one's misdeeds, not only the crime of which he was convicted, but the underlying and surrounding misconduct connected with that conviction, completely and candidly acknowledging exactly what one did, without vagueness or avoidance.

Two recent Arizona cases help illustrate what is necessary to satisfy the heavy burden imposed on a bar applicant with prior convictions for murder and attempted murder. In *In re Hamm* (211 Ariz 458, 463, 123 P3d 652, 657 [2005], *supra*), the bar applicant had been convicted of two murders some 30 years earlier. The court rejected his application to be admitted to the bar because he failed to show that he was of good moral character, particularly noting a lack of candor and a failure to accept full responsibility for his criminal acts. The Court explained, "Although he *told* the Committee that he accepts responsibility for [one victim's] murder, in fact he consistently assigns that responsibility to his accomplice. His testimony revealed almost no attention to the commission or aftermath of [the victim's] murder" (211 Ariz at 464, 123 P3d at 658). Furthermore, the Court observed that the applicant had not been completely forthright in his hearing testimony, continuing to insist that he did not intend to kill, but only to rob, his victims, while the facts demonstrated otherwise (*id.*).

In *In re King* (212 Ariz 559, 136 P3d 878 [2006]), the Arizona court considered the application of a Texas man who, decades earlier, when he was a 24-year-old deputy constable, had shot two known felons outside a bar, while he was intoxicated. He had been indicted for two counts of attempted murder, and pleaded guilty to one count of attempted murder, but later his seven-year sentence was suspended, and thereafter his conviction was set aside. The applicant subsequently graduated from college and law school, passed the Texas bar examination, and was admitted to practice there in 1994, where he practiced law without incurring any disciplinary charges. In denying the applicant's application for admission to the Arizona bar, the court was particularly concerned about his rehabilitation. It observed that his written applications for admission to law school and to the Arizona bar "minimized his personal responsibility for the shootings" (212 Ariz at 564, 136 P3d at 883). Although he ap-

propriately stated that he was " 'stricken with remorse,' " he created the impression that he had a defense to the shootings but chose to plead guilty to one charge after weighing his chances for success. The court explained that "[h]is suggestion that only circumstances beyond his control prevented him from mounting a successful defense is inconsistent with the notion of acceptance of responsibility" (*id.*).

Like the applicants in *Hamm* and *King*, petitioner *still* fails to candidly acknowledge all of his actions on the night of the shootings. Most importantly, he never clarified the critical events surrounding his firing of the gun five times. Accepting as valid his refusal to admit harboring an intent to kill his girlfriend when he shot the gun on the evening of July 13, 1983, there are still various other elements of his criminal conduct that petitioner has persisted in sidestepping. Instead of a cogent and thorough recitation of exactly what occurred, the testimony petitioner gave at the most recent hearing was correctly—if mildly—characterized in the subcommittee's report as "less than articulate," albeit not intentionally untruthful. That characterization understates the evasive, vague, and self-justifying nature of some of his testimony before the subcommittee.

His testimony should have contained a full, clear, straightforward admission of all his criminal conduct toward his girlfriend that night. He should have acknowledged that he convinced her to meet with him through the use of false pretenses, that he used duress to compel her to accompany him back to her apartment, that he used the threat of violence (to himself or to her) to keep her with him, and that in order to get away from him she was left with no option but to jump out the window. Even more importantly, he should have to acknowledge that by firing a gun out the window out of which she was fleeing from him, even if he was not intending to aim at her, he was both menacing and endangering her, as well as anyone else in the area. Yet, at the 2010 hearing regarding the events leading up to the shooting, he *still* failed to acknowledge the totality of his misconduct, continued to characterize his state of mind in July 1983 as suicidal, and minimized or completely ignored the immediate and long-term effects of his actions on his ex-girlfriend.

Rather than fully facing the truth in regard to his firing five shots as his ex-girlfriend ran from him, petitioner denied shooting not only at her but in her general direction, without ever explaining how shooting out the very window she had just

jumped from could possibly *not* be shooting "in her direction." He began to offer an explanation, saying, "I shot out the window at the ground, that's true, but . . . ." However, a subcommittee member interrupted his answer to explain that it was hard to believe that he was not threatening his girlfriend or intending to harm her given the objective facts of his conduct. When petitioner began to protest that the facts characterized by the inquiring subcommittee member as "objective facts" were actually false, his own attorney intervened and indicated that she wanted to ask a series of questions to clarify what petitioner recalled from that night, to establish his subjective understanding. The ensuing discussion then focused on petitioner's drug use that day and how it influenced his mental state, rather than on the shooting. The subcommittee never got back to petitioner's view of the facts regarding the shooting, except to the extent of indicating its understanding that petitioner "is certain he did not intend to kill her that night."

As to the ex-girlfriend's jumping out the window, at the 1995 hearing petitioner acknowledged her trial testimony, yet, by his narrative, her leap seemed unnecessary and puzzling. His story was that at around 1:30 or 2:00 A.M. he said, "You have to get up for work. I will leave," and he went into the bathroom, and when he emerged she was inexplicably hanging out the window, just about to drop to the ground. He said he did not recall if he had left her alone at all up to that point. No inquiry was made, nor any explanation provided, as to why, if he gave her no reason to think he was preventing her escape, she would feel the need to leave by way of the second-story window, rather than the door, while he was in the bathroom. This puzzling circumstance was not even addressed in petitioner's 2010 hearing testimony, let alone explored or clarified.

Leaving aside the question of whether he had the intent necessary for attempted murder, he seemed to suggest that he had committed no crime at all. For example, referring to his display of the gun to her, he said, "I think it was clear, or thought it was clear. I think I—I'm not sure whether I still think it was clear—I may still think it was clear that the purpose of the gun was not—that it was clear that the purpose of the gun was not to shoot her, but to shoot me." He further stated, "I believe that I did not threaten her." He eventually made inroads into stating the complete truth when he acknowledged that even though at the time he did not think she was afraid of him, "I have come—and I understand my perception of what happened

that night was—was off," and that he now recognizes that she was, in fact, afraid of him that night. But that recognition was too little, too late.

So, although petitioner has taken some of the requisite steps toward his rehabilitation, such as satisfying the "threshold requirement [of establishing] a prolonged period of good conduct" (*see* Ritter at 20), examination of his hearing testimony reflects that in some substantial ways, he continues to evade responsibility. It seems to me that before we hold petitioner's moral character to be sufficiently rehabilitated and that he is fit to practice law in this state, he should *at least* acknowledge *exactly* what he did, without evasion, demonstrating with articulate recitations and explanations that he recognizes the criminality of his conduct, and has taken responsibility for it. Rather than responding defensively to questions, or avoiding an exploration of exactly what occurred, such as the direction in which his shots were fired in relation to the direction in which his girlfriend had taken, and how he reconciled her perceived need to escape through the window with his narrative of the events up to that point, he should welcome the opportunity to articulately acknowledge the exact events of that night, and his responsibility for them. Until he has done that, his expressions of remorse for what he did to his ex-girlfriend ring hollow and self-serving. His "less than articulate" recitation, which attempts to at least partially exculpate his conduct, cannot be enough.

I recognize that his attempted explanations were interrupted more than once by questions put to him by subcommittee members and by his own attorney. However, this does not justify a failure to fully acknowledge his criminal conduct. If he really intended to do so, he would not let interruptions prevent a full acknowledgment of the events.

The majority chooses to focus primarily on petitioner's successful practice of law since his admission to the bar of New Jersey in 2005. Of course, that state's determination on the issue of petitioner's moral character does not bind us. Nor does his admission to a variety of federal courts carry any greater weight; indeed, those courts generally do not conduct an independent review of an applicant's moral character.

The majority inaccurately, and hyperbolically, characterizes my position as imposing an ephemeral moral requirement by which the court must speculate about the applicant's thought processes. In fact, the requirement I would impose is one to

which the majority gives lip service: candor. I would not admit him until he candidly confronts all of the evidence given against him. I do not demand that petitioner testify that he intended to kill his ex-girlfriend; I simply demand that he fully acknowledge that which he actually did, that which he does not recall, and that which he affirmatively disputes, especially regarding those pieces of evidence that tend to show he was victimizing her, rather than asking for her voluntary assistance.

None of the foregoing is intended to force petitioner to conduct an "endless quest," or to impose a "continuing punishment," as the majority suggests. Indeed, I agree with the majority that it is possible for petitioner to be fully rehabilitated. But, unlike the majority, I cannot accept that petitioner can successfully establish his rehabilitation by his subsequent acts alone, in the absence of a complete acknowledgment of his criminal conduct. The mere passage of time, with no other change in circumstances, is not enough, as long as petitioner fails to examine the ways in which he still justifies and minimizes his crime, rather than fully confronting it.

Not only does the majority fail to even acknowledge that petitioner is *still* minimizing his misconduct and avoiding acknowledgment of these painful and damning facts; it fails to explain why this applicant, who was denied admission to the bar without a hearing in 2006, has now successfully established his rehabilitation, based on his showing in 2009 of essentially the same facts as were alleged in 2006. If he was unable to overcome the "brevity of time" in 2006, what was it about the three years that followed that changed this panel's assessment of his character or his rehabilitation?

The majority focuses heavily on petitioner's character evidence, contained in the submissions and testimony by an impressively long list of well-known and high-powered supporters, in support of both petitioner's initial application for admission in 1995 and his current application. I do not question the sincerity of these witnesses' good faith belief that petitioner has turned the corner in his life, and is now an upstanding citizen, nor do I doubt that petitioner has made every effort, successfully, to change his lifestyle. But nothing in these individuals' assessments of petitioner's current moral character establishes that petitioner has reached the critical point of fully acknowledging and accepting responsibility for his actions.

In fact, many of these individuals' assessments seem to lack a full understanding of the extent of petitioner's crimes. For

instance, Federal District Court Senior Judge Gerard Goettel, who presided over the federal drug prosecution, in his 1994 letter in support, referred to the state charges against petitioner as "an assault charge where he made the mistake of representing himself" and in which he was given a "draconian" sentence. In addition to his incorrect assertion that petitioner had represented himself, when in fact his application to represent himself had been denied, Judge Goettel's characterization failed to acknowledge that the charges, and the original conviction after jury trial, were for more than assault; they were for attempted murder, burglary, unlawful imprisonment, and weapons charges.

Other character witnesses, such as former Appellate Division Justice John Carro and his former law clerk, attorney Albert Richter, seemed to accept petitioner's view of his actions on July 13, 1983. Of course, none outright rejected the testimony of petitioner's ex-girlfriend that he pointed a gun at her, threatened her, forced her to go with him to her apartment, held her there against her will for seven hours, and shot at her when she made her escape. Yet, they appeared to accept that petitioner's actions, though perhaps drug-addled, were benign, and that although "shots were fired," she had not been in any actual danger.

It strikes me that the subcommittee, which in 2009 was presented with evidence essentially similar to that before the 1995 subcommittee, ignored the difficult and problematic aspects of petitioner's assertions, and relied excessively on the conclusion that he was in a "highly agitated state, enhanced by the drugs he had taken," to justify his failure to provide a coherent narrative of what actually occurred that night, or even a partially-coherent narrative buttressed by an explanation of why he was unable to provide further information. The subcommittee's failure allowed petitioner to avoid acknowledging the complete truth regarding his actions. And now the majority does the same. It lets him off the hook by focusing on petitioner's consistent insistence that he did not intend to kill his ex-girlfriend. But, that point should not be the sole, or even primary focus. The majority hedges: "Perhaps his drug intoxication at the time confused his motives as well as his memory, or perhaps he sincerely believes that the way he remembers the event is the truth." In so doing, the majority allows itself to ignore that, in many important respects, petitioner never bothered to examine what he did, or the extent to which his purported memories were contradictory or illogical.

In order to satisfy his burden of establishing his rehabilitation, it is petitioner's responsibility to be clear when he acknowledges, disputes, or denies any recollection of the charged criminal conduct. If, for instance, petitioner's drug-addled mental state, or some other mental or psychological circumstances, prevent him from recalling whether he placed his ex-girlfriend's keys in a vase after locking the two of them inside her apartment, he should say so. If he has no recollection of threatening to handcuff her, he should say so. If he believes he shot the loaded gun in an entirely different direction rather than in her direction, he should say so. But until he faces the full extent of his misconduct, either to explain, dispute, or express regret for those acts, the proclamation of his rehabilitation is premature.

I have never suggested that petitioner's rehabilitative efforts and accomplishments be ignored; I recognize that petitioner has started down the road to redemption and rehabilitation. But, he simply has not gotten there. Despite the lengthy period of time that has elapsed, and petitioner's unblemished professional record, the grant of his application is premature, because he has not established his complete rehabilitation and will not be able to do so until his testimony fully acknowledges, and either admits, explains, or challenges the evidence contained in the trial transcript as to his past criminal conduct, rather than simply skirting around it. The majority has, in effect, accepted a new, watered-down standard for admission. It accepts that the mere passage of a lengthy period of time after an applicant completes a term of imprisonment for a serious felony conviction, during which period the applicant lives an unblemished life, combined with a murky expression of remorse and little acknowledgment of his wrongdoing, is enough to warrant admission to the bar. I do not believe that has ever been the standard for bar admission in New York, nor should it be now.

MAZZARELLI, MANZANET-DANIELS and ROMÁN, JJ., concur with TOM, J.P.; SAXE, J., dissents in a separate opinion.

Certificate recommending admission accepted, and motions denied.